# BUNKER HILL & S. MINING & CONCENTRATING CO. v. SCHMELLING.

## (Circuit Court of Appeals, Ninth Circuit.  February 23, 1897.)

1. MASTER AND SERVANT — UNSAFE PREMISES — FELLOW SERVANTS — INSTRUCTIONS TO JURY.

    In an action against a mining company for personal injuries, caused by the fall upon the plaintiff of a mass of ore, which it was alleged had not been properly shored up by the shift boss in charge of the gang with which plaintiff was working, whom the defendant claimed to be a fellow servant of the plaintiff, the court charged the jury that it was the duty of the defendant to provide the plaintiff with a reasonably safe place to work in, and that this duty could not be devolved upon an agent.  In another part of the charge the court expressly and fully instructed the jury that the carelessness of fellow servants was one of the risks assumed by the plaintiff, and that, if the accident could be traced to the negligence of a fellow servant of the plaintiff, the defendant was not liable.  *Held,* that the doctrine applicable to fellow servants was not withdrawn from the jury.

2. ADMISSIBILITY OF EVIDENCE—DIAGRAM OF PLACE.

    It is not error to admit, in connection with the testimony of a witness, a diagram of the place where facts testified to by him occurred, which diagram has been made from the witness' direction, and which he swears is correct.

3. TRIAL IN CIVIL CASES—SEALED VERDICT.

    In civil cases the court may, in its discretion, without regard to the consent or objection of the parties, authorize a jury to agree upon, seal, and bring in and present to the court a sealed verdict.

In Error to the Circuit Court of the United States for the District of Idaho.

W. B. Heyburn and John Garber, for plaintiff in error.

Albert Allen, for defendant in error.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

ROSS, Circuit Judge.    This was an action for damages growing out of personal injuries sustained by the defendant in error, who was plaintiff in the court below, alleged to have been sustained by him by reason of the negligence of the plaintiff in error, who was defendant below.    The plaintiff was employed as a laborer in the defendant's Bunker Hill Mine, and at the time of the accident was engaged in shoveling ore in the Williams stope of that mine, alleged in the complaint to consist of a large chamber about 200 feet in length, about 100 feet in width, and from a few feet to 30 or 40 feet in height.    The complaint alleged that on the 16th day of February, 1894, the defendant had a large number of men, including the plaintiff, employed in extracting ore from the Williams stope, by reason of which it was the duty of the defendant to keep and maintain the stope in good and safe condition;  that on and prior to

February 16, 1894, the defendant carelessly and negligently mined out the ores and rock from the stope in question, carelessly and negligently leaving great masses of overhanging rocks and ore with scarcely any support, and in such condition that they were liable to fall at any moment, and that by reason thereof the stope became and was a dangerous place for persons to work, which fact, by the use of reasonable care and prudence on the part of the defendant, ought to have been known to it, and in fact was so known; that on February 16, 1894, the defendant, through its officers and agents having charge of the works, well knowing that the Williams stope was an unsafe and dangerous place for persons to work, and well knowing that the overhanging rocks and ore were not well supported, and were liable to fall at any moment, carelessly and negligently required and directed the plaintiff to work therein at shoveling rock and ore; and that while so engaged, without any fault or negligence on the part of the plaintiff, and without any knowledge on his part that the place was dangerous, a large quantity of the rock and ore from the roof of the stope fell upon the plaintiff, seriously injuring him.

The answer of the defendant admitted the employment of the plaintiff as alleged by him, denied the extent of the Williams stope as alleged, but admitted that it was about 200 feet in length, about 58 feet in width, and from 7 to 10 feet in height, and had been made by the defendant in extracting ores therefrom. It admitted that on the 16th day of February, 1894, it was engaged in mining and extracting ore from the Williams stope, and had engaged and employed therein a large number of men, including the plaintiff; and that by reason thereof it became and was the duty of the defendant to keep and maintain that stope in as good and safe a condition as it was possible to keep and maintain the same, so that such persons so employed would not be subject to danger. And the defendant alleged that on the said 16th day of February, 1894, and at all the times mentioned in the complaint, the defendant exercised great care in examining and in inspecting the mine for the purpose of keeping and maintaining the same, and every part thereof, including the Williams stope, in safe condition, in order to avoid all possible danger to its employés; that such examination and inspection was made by competent and skillful miners employed by the defendant for the purpose, and that the miners so employed determined that the stope in question was safe, and free from danger, and that there was nothing in or about it from which the most skillful and careful miner or workman, including the plaintiff, could reasonably expect or anticipate any danger. The answer denied all the allegations of negligence charged in the complaint, and alleged that the ore in the Bunker Hill Mine is in the ledge in large masses or ore bodies, in extracting which it is necessary to excavate large chambers; that, after blasting for the purpose of breaking down the ore in the chambers, the defendant at all times, acting through skillful and competent men, made careful and thorough examinations and inspections of the rock and ore surrounding the excavations, and at all times, including the 16th day of February, 1894, took every

care and precaution to protect its employés, and to prevent injury to them, and that the fall of the rock which caused the accident to the plaintiff could not be foreseen or provided against by the most skillful and careful inspection, and was not the result of any fault or negligence on the part of the defendant.    The answer further alleged that at the time of the accident to the plaintiff the stope in question was in as safe a condition as it was possible under the most skillful supervision of competent miners to keep it; that the plaintiff was accustomed to working in mines of a similar character to that of the defendant, and was competent to judge of the safety of the stope where he was working; that the risk of working therein was assumed by him as a part of his employment, with the full knowledge of the condition thereof; that the walls of the stope in question were sound, solid, and well supported at all times, and that no rock or other substance at any time fell from either the roof or walls of the stope; that whatever rock did fall in the mine consisted of ore, and fell from the breast of the stope, and not elsewhere, and did not amount altogether to over 10 or 15 tons in quantity; that the persons whose immediate duty it was, and upon whom the responsibility rested, to keep the mine in a safe and proper condition at the point wherein the plaintiff was working at the time of his injuries, were all fellow servants of the plaintiff.

The trial of the case resulted in a verdict for the plaintiff.    The record shows that the night before the accident one of the witnesses for the plaintiff called the attention of the night-shift boss to the cracks in the ore and rocks in the roof of the chamber where the accident occurred; and the principal point made at the oral argument in behalf of the plaintiff in error was that the neglect of the shift boss to properly support the roof, after his attention had been thus called to the cracks in it, was the neglect of a fellow servant of the plaintiff, which neglect was, in effect, withdrawn from the consideration of the jury by the instructions of the court below to the effect that the duty devolved upon the defendant company to provide the plaintiff with a reasonably safe place in which to work, and that that duty could not be devolved upon an agent so as to exonerate the defendant from liability for neglect in that regard. In a subsequent portion of its charge the court instructed the jury as follows:

"In employment such as stoping ore from mines in large stopes, such as are shown to exist in the mines of the defendant where the injury is alleged to have occurred, it is to be expected that the danger to the workmen will be greater at some times than at others.    From the very nature of the work, the obligation of the employer to provide a reasonably safe place for his employés to work upon and in does not oblige him to keep the place where they are employed in such occupation as stoping ore from the mines, in a safe condition at every moment of their work, so far as its safety depends upon a due performance of their work by them or their fellow servants.    That is a request which the defendant asks.    I give it, with this explanation: To illustrate: You have seen by the testimony here that this work is carried on by cutting off slabs of ore from the roof of the stope.    It is cut down in benches or in blocks. They start and stope along, and here is a block of ore standing square, I presume like that: here is the floor running along in this direction: up above here is the ore.    Now, you must see that there are times when everything cannot be absolutely safe, cannot be kept as safe at one time as at another.    For

instance, when that block of ore is being cut off, it is more or less without supports under it; for the time being there is more risk there than there would be at other times. Now, that is what that instruction means,—simply that there are times when the danger must be greater than at other times, because it necessarily must follow that in mining you cannot keep timber so thick under it that it would be absolutely safe at all times, because that ore must be taken down. It is one of the natural risks that men must incur in mining, that these blocks of ore must be left at some times so they can get them down. That is as far as I mean that instruction to go."

No issue was made in the case in respect to the duty of the defendant to furnish the plaintiff with a safe place in which to work. The complaint alleged that duty on the part of the defendant, and the answer of the defendant conceded it. The defense made by the answer was that the defendant performed that duty, but that the rock that fell upon the plaintiff and injured him consisted of ore that fell from the breast of the stope, and that the persons whose duty it was, and upon whom the responsibility rested, to keep the mine at that point in a safe condition were fellow servants of the plaintiff, for whose neglect in that regard the defendant was not responsible; and that the risk of working where he was injured was assumed by the plaintiff as a part of his employment, with full knowledge of all of the surrounding conditions. The record does not contain the evidence in the case. But the court below stated in the portion of its charge above quoted that the testimony showed that the mining was carried on by cutting off slabs of ore from the roof of the stope, and the court proceeded to explain to the jury that when such a block was being cut down it was, of necessity, more or less without supports under it, and that, as a consequence, there was at such times necessarily more risk to the miners than at other times, which risks the miners assumed as one of the incidents of their employment. To this, as far as it goes, the counsel for the plaintiff in error do not object; but they insist that, as the real defense was the neglect of the shift boss to properly support or remove the ore that fell and injured the plaintiff, after having had his attention called to the cracks in it, the defendant was entitled to the benefit of the doctrine applicable to fellow servants, and that that doctrine was, in effect, withdrawn from the consideration of the jury by the instruction that the duty of the defendant to furnish the plaintiff with a safe place in which to work could not be delegated to an agent. It does not appear from the record what the duties of the shift boss were. He may or may not have been the fellow servant of the plaintiff, depending, not upon his grade and control over the other members of his shift, but upon the character of the acts he was required to perform. Railroad Co. v. Peterson, 162 U. S. 346, 353, 16 Sup. Ct. 843; Mining Co. v. Whelan, 12 C. C. A. 225, 64 Fed. 462, 465, and authorities there cited. If he was such fellow servant, and the accident to the plaintiff happened through his negligence, the defendant was not answerable therefor. And so the court below told the jury; not, it is true, with specific and direct reference to the shift boss, but no such request appears to have been made of the court by the plaintiff in error, nor was the court requested to instruct the jury as to

what constituted a fellow servant of the plaintiff.    But the court, in its charge to the jury, did in express terms instruct the jury that among the risks assumed by the servant is the risk of carelessness on the part of fellow servants.    "The master is not responsible," said the court, "in any instance, for the accidents to a laborer which occurred from the carelessness of another fellow servant.    He is responsible for those acts of some other employé who is a vice principal of a master, or who is his direct agent; but he is not responsible for the accidents that result to him from the carelessness of a co-laborer.    So that in this case, if this accident could be traced to the direct carelessness, not of an agent or superior servant, but to some fellow servant and co-laborer, then the plaintiff would have to assume that himself.    Those, now, are among the risks that a laborer assumes in entering into employment,—that is, unforeseen accidents that cannot be guarded against, cannot be provided for; and, as I said, the accidents that may result from carelessness of a co-laborer.    If this accident resulted from any such causes as I have stated, the plaintiff cannot recover, etc."    It cannot be properly held, therefore, that the doctrine applicable to fellow servants was withdrawn from the consideration of the jury by the instruction that the duty of the defendant, admitted in his answer, to furnish the plaintiff with a safe place in which to work, could not be delegated to an agent.

It is also contended that the court below erred in admitting expert testimony in respect to the condition of the roof of the mine. The record, however, does not contain any such objection and exception as presents the question.

Another point made on behalf of the plaintiff in error is that the court, against the objection and exception of the plaintiff in error, admitted in evidence a diagram of the stope where the accident occurred, made by one Easton upon the representations of the witness Powers and others as to its appearance after the accident. Powers testified that it was a fair representation of the workings in the stope immediately after the accident, and the court admitted it, in connection with his testimony only as his version of the workings, which the jury might consider for what it was worth.    In this we see no error.

The only other point which need be specially noticed is the action of the court below in authorizing the jury, upon agreeing upon a verdict during the night, to thereupon seal it, and return it to the court upon its opening the following morning; the jury meanwhile separating.    To that course the defendant not only did not consent, but objected, and to the action of the court in the respect stated reserved an exception and objected to the receiving of the verdict so agreed upon, sealed, and brought into court; the jury having meanwhile separated.    The cases holding that this may be done by consent of the parties are very numerous.    Many of them will be found cited in the notes to pages 414–416, 28 Am. & Eng. Enc. Law.    And, as will be there seen, it has been held by some courts that, in the absence of statutory prohibition, the practice is admissible in the discretion of the presiding judge, with-

out regard to the consent of the parties, even in criminal cases. This is contrary to the general rule, but the tendency of modern decisions undoubtedly has been, as said in Com. v. Carrington, 116 Mass. 37, "to relax the strictness of the ancient practice which required jurors to be kept together from the time they were impaneled until they returned their verdict, or were finally discharged by the court." Whatever the proper rule may be in criminal cases, we think it may, in civil cases, be safely left to the sound discretion of the court, without regard to the consent or objections of the parties, to authorize a jury to agree upon, seal, and bring in and present to the court a sealed verdict. In such a case the verdict is to be put in writing before the jury separate, is thereupon sealed, and, when brought into court, is affirmed by the jury before it is received by the court. The judgment is affirmed.