WESTERN GAS CONST. CO. v. DANNER.

(Circuit Court of Appeals, Ninth Circuit. October 2, 1899.)

No. 515.

1. REVIEW ON APPEAL—DISCRETION OF TRIAL COURT—ORDER OF PROOF.

The order in which proofs are introduced is not ordinarily subject to review on a writ of error, and in no case will an appellate court interfere with the discretion of the trial judge in that regard, unless it clearly appears that there has been an abuse of such discretion to the prejudice of the party.

2. EVIDENCE—ADMISSIBILITY OF DIAGRAMS.

It is a common and proper practice in personal injury cases to receive models, maps, and diagrams to illustrate the testimony of witnesses by giving a representation of objects and places which cannot otherwise be conveniently shown or described to the jury, and it is no objection to the admission of a diagram for that purpose that its accuracy is controverted, such question being properly submitted to the jury.

3. PAYMENT—ISSUES AND PROOF—ACTION FOR TORT.

In an action to recover damages for a personal injury alleged to have been caused by defendant's negligence, the plaintiff is not required to allege and prove that such damages have not been paid.

4. DAMAGES—PERSONAL INJURY—SUFFICIENCY OF EVIDENCE.

In an action to recover damages for a personal injury, evidence of the charge made to plaintiff by a physician for treatment on account of such

injury may be submitted to the jury, although there is no proof that such charge was reasonable for the services required.

**5. CONTRIBUTORY NEGLIGENCE—WHEN QUESTION FOR JURY.**

Where the question of whether a person injured was warned of the impending danger in time to have escaped the injury is in dispute, and without such warning he had no reason to apprehend the danger, the question of his contributory negligence is one for the jury.

**6. TRIAL—REFUSAL OF INSTRUCTIONS.**

It is not error to refuse to charge the jury on a theory which finds no support in the evidence.

**7. DAMAGES—PERSONAL INJURY—DISCRETION OF JURY.**

In an action for a personal injury, which caused the plaintiff severe physical and mental suffering, and probably permanently affected his health and constitution, the question of damages is one to be left to the judgment of the jury; and, unless their verdict clearly indicates that they were influenced by passion or prejudice, it will not be disturbed.

In Error to the Circuit Court of the United States for the Northern District of California.

J. P. Langhorne, for plaintiff in error.

Platt & Bayne and J. W. Goad, for defendant in error.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge. This is an action to recover damages for injuries received by the defendant in error (hereinafter designated as "plaintiff") from the falling of a smokestack through the carelessness and negligence of the plaintiff in error (hereinafter designated as "defendant") in erecting the same. The defendant's answer denied the allegations of the complaint, and affirmatively alleged that the injuries which plaintiff received were occasioned by his contributory negligence, "by reason of his failure to exercise ordinary and reasonable care and prudence in regard to his personal safety." The plaintiff, at the time of the accident, was engaged as an employé of the Colusa Gas Company in building a brick wall about 20 feet distant from the smokestack in question. The jury found a verdict in his favor for the sum of $2,500. There are seven assignments of error, which will be noticed in the order of their presentation. Assignments 1 and 2 will be considered together.

1. It is claimed that the court erred in admitting in evidence two diagrams; one (b) showing the position of the smokestack, the position of the temporary guy ropes that were attached to it when it fell, and the position of the permanent guy ropes that were attached to it at the time the diagram was made. The other (c) represents the position of the plaintiff when he was struck by the falling stack, the position of the stack after its fall, and the building of which it was a part. These diagrams were made by one St. Maurice, a civil engineer, who testified that he was not present at the time the accident occurred, and did not know, of his own knowledge, how the guys of the smokestack were arranged at the time of the accident; that he had located the position of the guy ropes in part from the information he had received from other persons and in part from actual measurements. At this stage of the testimony the diagrams were offered in

evidence. The grounds of the objections were that the diagrams were mere hearsay; that they were not made by the draftsman from his own knowledge, and that they were not the best evidence; and that there was no evidence tending to show that the diagrams were correct. It may be admitted that it would have been the better practice not to have admitted the diagrams in evidence until some witness or witnesses had testified that they were correct; but the order in which testimony shall be introduced is largely within the discretion of the court, and, as such testimony was given afterwards on that point, the error, if any, existing at the time of their admission, was cured by the subsequent testimony of other witnesses. The order in which proofs are introduced cannot, ordinarily, be subject to review on writ of error, and in no case should an appellate court interfere with the discretion of the trial judge, unless it clearly appears that there has been an abuse of such discretion to the prejudice of the party. It does not so appear in this case. St. Maurice testified that the green lines on (b) purport to represent the guy lines of the smokestack at the time it fell, as stated to him; that he took it from actual survey; that the green line running in a northwesterly direction to a point called "walnut tree," the one running in a southwesterly direction to a point called "eucalyptus tree," and one running in a southeasterly direction to a point called "post in fence," are the guy lines; that he obtained the information as to the location of these lines from the workmen who claimed to be there when the accident happened, viz. Kuhn, Clement, and Goad; that the black line running almost due north from the smokestack to a point called "guy post" is one of the present guy lines holding the smokestack in position; so is the black line running in a southwesterly direction to a point called "guy post," and the black line running southeasterly to a point called "guy post"; that the positions of these lines were obtained by actual measurement and survey; that the point to the right of the smokestack at a spot called "gin pole" was located from information given by Kuhn; that the other lines on (b) are located from actual survey, and are as they now exist; that the diagram (c) represents the staging and correct position of Mr. Danner at the time he was building the west wall when the accident occurred; that this was located according to information given to him, principally by Mr. Danner. Kuhn testified that he assisted in erecting the smokestack and tying the guy lines; that he pointed out to St. Maurice, as near as he could, the spot on the ground where the gin pole was; that the guy line running north was tied to the third tree from the eastern end; that he pointed out to St. Maurice the tree which he identified as the one to which he tied the guy line; that to the west he tied the guy line to a eucalyptus tree; that he pointed out to Mr. St. Maurice the tree that the guy line was tied to; that the third guy was attached to a fence post in the eastern boundary fence; that he pointed it out to Mr. St. Maurice, and identified it from the marks of the old guy line. Clement testified that he fastened the guy lines, helped raise the gin pole, and guyed it, fastened the sling around the top of the gin pole, put the blocks on it ready for raising it, and helped raise the stack; that the guy line to the stack where it was first raised running to-

wards the north was tied to a walnut tree, and that he helped tie it; that he pointed out this tree to Mr. St. Maurice; that the marks of the wire were around the tree; that he helped to raise the stack the second time, and it was raised on the same spot where it first stood; that he helped tie the original guy to the eucalyptus tree on the west, and pointed it out to Mr. St. Maurice as the particular tree, and that he was positive in his identification. The testimony as to whether or not the diagrams were correct was, upon some points, conflicting. The objections to the admission of the diagrams were properly overruled on the ground that, as clearly shown by the record, they were not admitted as evidence of any substantive or independent fact, or upon the ground that they were correct, but were admitted simply for the purpose of being used in illustrating the testimony of the witnesses. Shook v. Pate, 50 Ala. 91. The court, at the time of overruling the objections, said:

"It is not admitted as a truthful map, but simply as an illustration of the testimony of the witness. Whether or not it is a truthful map is a matter of proof. With that explanation, your objections are overruled, and the map will be received in evidence; but, of course, not as an absolutely truthful representation of the ground."

The court, in its charge to the jury, said:

"I instruct you that the important matter here is not the number of guys so much as it is the manner in which they were placed. And there is this important question for you to determine in this case: The plaintiff has introduced a map here, certain green lines upon which are alleged to indicate the way in which those guys were temporarily placed. If the guys were placed as represented upon that map, it is evident to any eye, and is admitted by all parties, that they would not be a support to the smokestack. The defendant says that those guys were not so placed. That is one of the important questions for you to determine, as I have said,—whether those guys were placed as represented by the plaintiff, or whether they were placed differently."

Moreover, the material question of fact was whether the smokestack fell by reason of any negligence on the part of the defendant. The undisputed testimony shows that, if ordinary care had been exercised in erecting the smokestack, it could not have fallen without the guys breaking or the fastenings giving away. The guys did not break; the fastenings did not give way; there was no high wind, or any convulsion of nature, to cause it to fall, unless it was unskillfully, carelessly, or negligently erected; there was no dispute as to the direction in which the smokestack fell, or its position after it fell, or any controversy as to the position of plaintiff when it fell, or that in falling it struck the plaintiff.

In Le Beau v. Construction Co., 109 Mich. 302, 67 N. W. 339, the court said:

"A map was introduced in evidence, which plaintiff claims was not correct. There was proof, however, that it was approximately correct, and one witness testified it was accurate. Its admission was not error. Hoffman v. Harrington, 44 Mich. 184, 6 N. W. 225; Battishill v. Humphreys, 64 Mich. 494, 31 N. W. 894."

In Concentrating Co. v. Schmelling, 24 C. C. A. 564, 79 Fed. 263, 267, this court said:

"Another point made on behalf of the plaintiff in error is that the court, against the objection and exception of the plaintiff in error, admitted in evi-

dence a diagram of the stope where the accident occurred, made by one Easton upon the representations of the witness Powers and others as to its appearance after the accident. Powers testified that it was a fair representation of the workings in the stope immediately after the accident, and the court admitted it, in connection with his testimony, only as his version of the workings, which the jury might consider for what it was worth. In this we see no error."

In Clegg v. Railway Co. (Sup.) 37 N. Y. Supp. 130, the defendant objected to the admission of a diagram which plaintiff testified was a perfect diagram of the place where the accident occurred, except it was not drawn to a scale, on the ground that it showed something more than the geographical features of the place of the accident. The court said:

"No doubt it did, but it was, nevertheless, admissible, when considered in connection with the testimony of the plaintiff given at the time it was received by the court; for the fair purport of what he said in response to questions by counsel for the defendant at that time was that his own position and that of the car and the workmen were correctly indicated upon the map. The situation was thus no different from what it would have been if the witness had taken a diagram of the street and railroad track alone, and had marked thereon, in the presence of the court, the position of the car, the workmen, and himself just prior to the collision. This is often done upon a trial, and the propriety of allowing a witness thus to aid his oral evidence has, so far as I know, never been questioned."

It is always competent in a personal injury case to show the entire surroundings of the place where the accident occurred. This can be done with or without a diagram. It is, however, a common and proper practice in courts of justice to receive models, maps, and diagrams, or sketches, drawn on paper, or traced with chalk on a blackboard, for the purpose of giving a representation of objects and places which cannot otherwise be as conveniently shown or described by the witnesses to the jury. If the accuracy of the representation is controverted, it is always a question for the determination of the jury, like any other question of fact. Assignments of error 1 and 2 are not well taken.

2. At the close of the plaintiff's testimony the defendant moved the court to grant a nonsuit "on the ground that there was neither allegation in the complaint nor proof that the alleged damages had not been paid and satisfied." This assignment is devoid of merit. This is too clear for discussion. Counsel cites numerous cases where it is held, in actions for nonpayment of money, that the complaint must allege, and proofs show, that the debt sued for has not been paid; but such cases have no application to actions brought to recover damages for personal injury. No case has been cited, and we apprehend that none can be found, that nonpayment of damages must be alleged in actions of this character.

3. It is next claimed that the court erred in instructing the jury that there was proof tending to show that the plaintiff's physician would charge him $100 for his services while attending him for the injuries he received from the falling of the smokestack. The pleadings and evidence necessary to be considered upon the assignment of error are as follows: It is alleged in the complaint that plaintiff "has become liable for a physician's fees to the amount of three

hundred dollars, and for a druggist's bill to the amount of fifty dollars, for medical services and drugs furnished said plaintiff on account of the injury received by him from the falling of said smokestack; that by reason of the injury so received by said plaintiff by being struck by said smokestack as aforesaid, and his liability for said medical attendance and drug bill as aforesaid, plaintiff has been damaged in the full sum of $5,500." Dr. West, who attended him during his illness, testified that plaintiff was indebted to him for "medical attendance about $100 between August 7th and August 23d." There was no direct evidence as to whether this sum was reasonable or not. The reasonableness of the charge in such cases does not solely depend upon the testimony of experts, although such testimony is proper, and entitled to weight, and is usually given as an aid to the jury in determining the proper amount to be allowed; but the jury have the right, in this connection, to consider the character and extent of plaintiff's injury, and the extent and character of the medical services and treatment he received, and from all the evidence determine the amount that should be given. The court, in instructing the jury in regard to the manner of estimating damages, said:

"The next item is the amount that he has paid out, or is liable to pay out, for his medical attendance and treatment. He has not proven anything here as being the amount paid for drugs or medicines, and the only proof, to my recollection, in this respect, is that tending to show that the doctor will charge him one hundred dollars for his services up to the time this action was commenced, and that is as far as you can estimate it."

The court further charged the jury:

"That the amounts that you find from these several items of damage to which I have referred will not be reported separately by you, but they will be put in one sum, and inserted in your verdict, if you find in favor of the plaintiff."

Whether the amount of $100 for medical attendance was allowed by the jury is a matter of mere conjecture, but, conceding that it should be so considered, it is apparent from the facts contained in the record that no error occurred in allowing it.

In Colwell v. Railway Co., 57 Hun, 452, 455, 10 N. Y. Supp. 636, the plaintiff, in order to prove the pecuniary loss which she had incurred by reason of the injuries she received, testified that she employed a nurse, who remained with her for six weeks, to whom she paid $100. There was no other evidence introduced as to the value of the services of the nurse, and no evidence to the effect that such a charge was reasonable. The counsel for the defendant asked the court to instruct the jury that the plaintiff could not recover the amount paid to the nurse, because there was no proof as to what the services were reasonably worth. It was held upon appeal that the trial court did not err in refusing to give this instruction.

In Scullane v. Kellogg (Mass.) 48 N. E. 622, the court said:

"Although there was no distinct proof of the amount of the expenses of sickness or medical attendance, the jury might allow what, in their opinion, was a reasonable sum."

In Donnelly v. Hufschmidt, 79 Cal. 74, 21 Pac. 546, the court held that in an action for personal injuries occasioned by the negligence of the defendant the plaintiff is entitled to recover the amount incurred for nurse hire, medicines, and physicians' services, although the same have not been paid.

4. It is contended that plaintiff was guilty of contributory negligence, and that the court, for this reason, erred in refusing to instruct the jury to find a verdict in favor of the defendant. Some testimony was given on behalf of defendant to the effect that plaintiff was warned in time to get out of the way, and that he had ample time to do so, as the stack fell very slowly. The plaintiff, at the time of the accident, was engaged, as before stated, as an employé of the Colusa Gas Company, in building a brick wall about 20 feet distant from the smokestack. He had nothing to do with erecting the smokestack. He was at the place where it was his duty to be under his employment. He had the right to assume, there being no apparent danger, that the defendant, in its work, would exercise ordinary care. The erection of the smokestack in question was not shown to be extrahazardous. The testimony on behalf of plaintiff was to the effect that it would not have fallen if ordinary care had been used in properly placing the guys. The plaintiff testified that he saw the stack standing erect when it was put in place, and supposed everything was all right, and went right on with his work; that he heard no warning; that he heard no noise, and was busy at his work; that he did not know that the stack was falling until he was hit by it. The law is well settled "that it is not contributory negligence not to look out for danger when there is no reason to apprehend any." 1 Beach, Cont. Neg. § 38. In other words:

"If the injured person had no actual knowledge of the danger that threatened him, and if, in the exercise of ordinary care under the circumstances, he would not have apprehended such danger in time to avoid the consequences of the defendant's negligence, he cannot be charged with contributory negligence." 7 Am. & Eng. Enc. Law (2d Ed.) 391, and numerous authorities there cited.

In Fraler v. Water Co., 12 Cal. 555, 558, in illustrating this point, Baldwin, J., said:

"We apprehend, if a man carelessly fires a gun into the street, that it would scarcely be admissible for him, when sued for the injury done another by it, to say that by reasonable care the other might have gotten out of the way." ·

The court instructed the jury fully and clearly on every phase of the case discussed by counsel,—certainly as favorably to the defendant as the law would warrant. The court charged the jury that it was the duty of the plaintiff to exercise ordinary care to avoid the injury; that it was the duty of the jury to decide "whether the raising of that stack was such a dangerous piece of work that plaintiff should have taken notice of it, and should have avoided all risk by removing from it." Moreover, "if you find from the evidence that the stack fell slowly, that the plaintiff was warned that it was falling, and that he, by the exercise of ordinary and reasonable care, and regard for his personal safety, could have

gotten out of the way of the falling stack, then I instruct you that the plaintiff was guilty of such negligence as to prevent any recovery by him, and your verdict should be for defendant." What more could defendant ask? From all the testimony it was clearly a question of fact to be submitted to the jury whether plaintiff exercised ordinary care, or was guilty of any negligence which contributed to the injuries he received. The supreme court of the United States has repeatedly declared that questions of negligence and contributory negligence are, as a general rule, questions of fact to be passed upon by a jury, and that it is only in cases where the undisputed evidence is so clear and conclusive that the court would be compelled to set aside a verdict returned in opposition to it that it should withdraw the case from the consideration of the jury, and direct a verdict. Elliott v. Railway Co., 150 U. S. 245, 246, 14 Sup. Ct. 85, 37 L. Ed. 1068; Southern Pac. Co. v. Pool, 160 U. S. 438, 440, 16 Sup. Ct. 338, 40 L. Ed. 485; Warner v. Railroad Co., 168 U. S. 339, 348, 18 Sup. Ct. 68, 42 L. Ed. 491. It would have been gross error for the court, upon such facts as are shown in the record, to have instructed the jury to find a verdict for defendant.

5. The next assignment—that the court erred in refusing to instruct the jury as to defendant's liability if it should find that the stack fell by reason of some undisclosed defect in the appliances—is wholly untenable. There was no evidence tending to show that the accident occurred by reason of any undisclosed defect. The evidence does show that the wires did not break; that neither the trees nor post to which they were tied gave way. There is no claim that the stack broke, that the foundation sunk; and it would require a miscroscopic mind to discover from the record that there were any latent defects in the guys or smokestack. The same stack and the same guys have been in use ever since the accident, and no defect has been found in them. It is simply and solely a question whether defendant exercised due and ordinary care, and whether or not the injury occurred by reason of negligence on the part of the defendant.

6. This brings us to the last assignment of error. Was the verdict of $2,500 excessive? A bare and brief statement of the facts on behalf of plaintiff is sufficient to show that this question must be answered in the negative. Plaintiff was 61 years of age; a bricklayer and plasterer by trade. His average yearly earnings had been, for several years, from $1,200 to $1,500. By reason of the accident he was confined to his bed 4 weeks, and to his house 44 days. For several weeks he suffered intense pain. He had to lie upon his back. Could not raise his head, or turn over. The pain was continuous, night and day. Could not sleep, without taking opiates, for over two months. The pain in his neck and shoulder continued to and existed at the time when the case was tried. Dr. West testified that he had known the plaintiff, and been his family physician for 18 years; that immediately after the accident the plaintiff was suffering so that he could not bear to have his head moved; that he did not have the power to move his head, or neck, or shoulder, or arm on the left side; that there was a deep and

sharply-defined wound on the right side of his head, beginning near the back cross seam of the head; that this cut was deep enough to go down to the muscle covering the bone of the head; that there was another bruised wound on the left side of the head; that he is suffering from a loud roaring in his head; that he is still unable to move his head and neck, through the lack of power of the muscles in the left side of his neck; that since the accident he has complained of impairment of hearing and of memory; that there has been a steady let-down in his general vitality; that what the effect in the future of the congestion and contusion will be no man can tell. "From my knowledge of Mr. Danner, he is not physically capable of following his trade, as he was prior to the accident; and never will be. His disability may be complete after a while. There may be great mental impairment. * * * All these are in the range of possibilities, and whether they will be probabilities or certainties depend upon time. I think that he is now as well as he will ever be again. His ability to do work has been very much impaired. He cannot go up any high place without growing dizzy. He cannot work in the sun without becoming dizzy. His muscular ability has been exceedingly impaired in the lack of the ready use of the left arm." In the very nature of the case, there is no precise rule for estimating damages for bodily pain and suffering. The amount cannot be arrived at with any degree of mathematical certainty. As was said in The City of Panama, 101 U. S. 463, 464, 25 L. Ed. 1061:

"Damages in such a case must depend very much upon the facts and circumstances proved at the trial. When the suit is brought by the party for personal injuries, there cannot be any fixed measure of compensation for the pain and anguish of body and mind, nor for the permanent injury to health and constitution, but the result must be left to turn mainly upon the good sense and deliberate judgment of the tribunal assigned by law to ascertain what is a just compensation for the injuries inflicted."

It is sufficient to show to the jury the extent of the injury, and the amount of the verdict must be determined by the jury in the exercise of their sound and deliberate judgment; and it necessarily follows that, unless the amount of the verdict is such as to clearly indicate that it was given under passion or prejudice, it should be sustained. Engler v. Telegraph Co. (C. C.) 69 Fed. 185, 188, and numerous authorities there cited; Telegraph Co. v. Engler, 21 C. C. A. 246, 75 Fed. 102; Clare v. Light Co. (Cal.) 55 Pac. 326, and authorities there cited.

The judgment of the circuit court is affirmed, with costs.